Slip Op. 20-87

# UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| **HABAŞ SINAI VE TIBBI GAZLAR ISTIHSAL ENDÜSTRISI A.Ş. ET AL.,** | |
| **Plaintiff and Consolidated Plaintiffs,** | |
| **and** | |
| **CHARTER STEEL and KEYSTONE CONSOLIDATED INDUSTRIES, INC.,** | **Before Claire R. Kelly, Judge** |
| **Consolidated Plaintiff-Intervenors,** | **Consol. Court No. 18-00144** |
| **v.** | |
| **UNITED STATES,** | |
| **Defendant,** | |
| **and** | |
| **NUCOR CORPORATION ET AL.,** | |
| **Defendant-Intervenors and Consolidated Defendant-Intervenors.** | |

## OPINION AND ORDER

[Sustaining the Department of Commerce's remand redetermination in the countervailing duty investigation of carbon and alloy steel wire rod from the Republic of Turkey.]

Dated: June 25, 2020

David L. Simon, Law Office of David L. Simon, of Washington, DC, for Habaş Sinai ve Tibbi Gazlar Istihsal Endüstrisi A.Ş.

Matthew M. Nolan, Arent Fox LLP, of Washington, DC, for Icdas Celik Enerji Tersane ve Ulasim Sanayi, A.S.  With him were Diana Dimitriuc-Quaia, Leah N. Scarpelli, Nancy Aileen Noonan, and Russell A. Semmel.

Maureen E. Thorson, Wiley Rein, LLP, of Washington DC, for Nucor Corporation. With her on the brief were Derick G. Holt and Jeffrey O. Frank.

Anna C. Motto, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, for Defendant.  With her on the brief were Joseph H. Hunt, Assistant Attorney General, Jeanne E. Davidson, Director, and L. Misha Preheim, Assistant Director.  Of counsel was Ayat Mujais, Attorney, Office of the Chief Counsel for Trade Enforcement & Compliance, Department of Commerce

Kelly, Judge: Before the court for review is the U.S. Department of Commerce's ("Commerce") remand redetermination filed pursuant to the court's order in Habaş Sinai Ve Tibbi Gazlar Istihsal Endüstrisi A.Ş. v. United States, 43 CIT __, __, 413 F. Supp. 3d 1347, 1361 (2019) ("Habaş").  See Final Results of Redetermination Pursuant to Ct. Remand, Feb. 7, 2020, ECF No. 69-1 ("Remand Results").  In Habaş, the court remanded for further explanation or reconsideration Commerce's final determination in the countervailing duty ("CVD") investigation of carbon and alloy steel wire rod from the Republic of Turkey ("Turkey").  See Habaş, 43 CIT at __, 413 F. Supp. 3d at 1350–51, 1561; see also Carbon and Alloy Steel Wire Rod from [Turkey], 83 Fed. Reg. 13,239 (Dep't Commerce Mar. 28, 2018) (final affirmative [CVD] determination & final affirmative critical circumstances determination in part) ("Final Results"), and accompanying Issues & Decision Memo. for Final Affirmative Determination, Mar. 19, 2018, ECF No. 20-4 ("Final Decision Memo");

see also Carbon and Alloy Steel Wire Rod From [Turkey], 83 Fed. Reg. 23,420 (Dep't Commerce May 21, 2018) (amended final affirmative [CVD] determination for [Turkey] and [CVD] orders for Italy and [Turkey]) ("CVD Order").   The court instructed Commerce to further explain or reconsider its selection of Eurostat data on natural gas import prices from Russia into Turkey ("Russian Eurostat data") as a tier two benchmark against which to measure the adequacy of remuneration for purchases of natural gas from the Government of Turkey ("GOT").  See Habaş, 43 CIT at __, 413 F. Supp. 3d at 1356–61.

On remand, Commerce reconsiders its reliance on Russian Eurostat data as a tier two benchmark, and instead relies on data from an International Energy Administration ("IEA") report that Commerce adjusts to construct a tier three benchmark.  See Remand Results at 6–7, 10–11.  For the following reasons, the court sustains Commerce's remand redetermination.

## BACKGROUND

The court presumes familiarity with the facts of this case, as set out in the previous opinion ordering remand to Commerce, and now recounts the facts relevant to the court's review of the Remand Results.  See Habaş, 43 CIT at __, 413 F. Supp. 3d at 1349–52.  On March 28, 2018, Commerce published its final determination pursuant to its CVD investigation of carbon and alloy steel wire rod from Turkey.  See Final Results, 83 Fed. Reg. at 13,240.  Commerce selected Habaş Sinai Ve Tibbi Gazlar Istihasal Endustrisi A.Ş. ("Habaş") and Icdas Celik Enerji Tersane ve Ulasim,

A.S. ("Icdas") as mandatory respondents for individual investigation.  See Respondent

Selection Memo. at 1, PD 67, bar code 3577988-01 (June 2, 2017);[1] see also Decision

Memo. for Preliminary Determination in [CVD] Investigation of Carbon and Alloy

Steel Wire Rod from [Turkey] at 4, C-489-832, Aug. 25, 2017, available at

https://enforcement.trade.gov/frn/summary/turkey/2017-18640-1.pdf   (last   visited

June 18, 2020) ("Preliminary Decision Memo").  Commerce relied on facts otherwise

available with an adverse inference ("adverse facts available" or "AFA")[2] to determine

subsidy rates for Habaş and Icdas after discovering unreported information about

respondents' use of the GOT's "Assistance to Offset Costs Related to AD/CVD

Investigations" program.  Final Decision Memo at 4–7.  When determining whether

Habaş benefited from its purchase of natural gas from the GOT for less than adequate

---

[1] On August 21, 2018, Defendant filed indices to the public and confidential administrative records underlying Commerce's final determination, on the docket, at ECF No. 20-5–6.  On February 21, 2020, Defendant filed indices to the public and confidential administrative records underlying Commerce's remand redetermination at ECF No. 70-2–3.  All references to documents from the initial administrative record are identified by the numbers assigned by Commerce in the August 21st indices, see ECF No. 20, and preceded by "PD" or "CD" to denote the public or confidential documents.   All references to the administrative record for the remand redetermination are identified by the numbers assigned in the February 21st indices, see ECF No. 70, and preceded by "PRR" or "CRR" to denote remand public or confidential documents.

[2] Parties and Commerce sometimes use the shorthand "adverse facts available" or "AFA" to refer to Commerce's reliance on facts otherwise available with an adverse inference to reach a final determination.  See, e.g., Final Results, 83 Fed. Reg. at 13,240; Final Decision Memo at 4–7.  However, AFA encompasses a two-part inquiry pursuant to which Commerce must first identify why it needs to rely on facts otherwise available, and, second, explain how a party failed to cooperate to the best of its ability as to warrant the use of an adverse inference when "selecting among the facts otherwise available."  See 19 U.S.C. § 1677e(a)–(b).

remuneration ("LTAR"), Commerce reconsidered its preliminary reliance on IEA data

as a tier two benchmark, opting instead to rely on Russian Eurostat data.  See Final

Decision Memo at 13–14.  Commerce assigned subsidy rates of 3.86 percent and 3.81

percent to Habaş and Icdas, respectively.  Final Results, 83 Fed. Reg. at 13,240.

Habaş, Icdas, and Nucor Corporation ("Nucor") commenced separate actions

pursuant to Section 516A of the Tariff Act of 1930, 19 U.S.C. § 1516a, and 28 U.S.C.

§ 1581(c) (2012),[3] which were later consolidated.  See Summons, June 19, 2018, ECF

No. 1;  Compl., July 12, 2018, ECF No. 6;  Order, Sept. 20, 2018, ECF No. 23

(consolidating Court No. 18-00144, Court No. 18-00146, and Court No. 18-00148

under Court No. 18-00144).  Habaş and Icdas challenged Commerce's application of

adverse facts available to determine their subsidy rates.  See Habaş, 43 CIT at __,

413 F. Supp. 3d at 1352–56.  Nucor separately challenged Commerce's selection of

benchmark data to calculate the benefit associated with purchases of natural gas for

LTAR from the GOT.  See Habaş, 43 CIT at __, 413 F. Supp. 3d at 1356–61.  The court

sustained Commerce's application of AFA to Habaş and Icdas, but remanded

Commerce's selection of the Russian Eurostat data as a tier two benchmark for

further explanation or reconsideration.  See Habaş, 43 CIT at __, 413 F. Supp. 3d at

1352–61.  Specifically, the court instructed Commerce to further explain or reconsider

its decision not to use the IEA data as a tier two benchmark, as well as its decision to

rely on Russian Eurostat data.  Id.

---

[3] Further citations to the Tariff Act of 1930, as amended, are to the relevant
provisions of Title 19 of the U.S. Code, 2012 edition.

On remand, Commerce placed new factual information ("NFI") on the record that tended to demonstrate export prices for natural gas from Russia were distorted by Russian foreign policy objectives, and invited the parties to comment and supplement the record with their own factual submissions. See Jan. 14th NFI Memo., PRRs 4–8, bar code 3930375-01–05 (Jan. 14, 2020). Nucor submitted NFI that tended to corroborate Commerce's NFI. See e.g., Nucor's Jan. 16th NFI Memo., PRR 16, bar code 3932768-01 (Jan. 16, 2020) ("Nucor's Jan. 16th NFI Memo"). Habaş submitted rebuttal NFI from, inter alia, the United Nations' COMTRADE database ("COMTRADE data"). See Habaş's Rebuttal NFI & Cmts., PRRs 10–13, bar codes 3932460-01–04, CRRs 1–5, bar codes 3932448-01, 3932452-01–04 (Jan. 16, 2020)[4] ("Habaş's Rebuttal NFI & Cmts.").

Commerce reconsidered its reliance on Russian Eurostat data as a tier two benchmark. See Remand Results at 5–11. In so doing, Commerce determined that prices for sales of natural gas from Russia into the European Union ("EU") were inappropriately based on Russian foreign policy objectives instead of commercial considerations. Id. Further, Commerce determined that both the COMTRADE data placed on the record by Habaş, and the Russian Eurostat data, likely contain pricing

---

[4] Cites to page numbers in Exhibit 1 of Habaş's Rebuttal NFI & Cmts are external, i.e., they do not correspond to the pagination printed on the documents contained in the exhibit, as these documents do not appear to be consistently paginated.

information for compressed natural gas ("CNG").[5]  Id.  Thus, Commerce rejected both

sources for use as a tier two or tier three benchmark.  Id.  Since some of the countries

used to source the IEA report are not connected to Turkey by pipeline, Commerce

inferred that the data does not reflect prices available to Turkish purchasers, and

declined to use the IEA data as a tier two benchmark.  Id.  Commerce instead relied

on the IEA data as a tier three benchmark, and adjusted the IEA reported average

unit value ("AUV") for natural gas to account for the distortive effect of Russian

export prices on the AUV for natural gas.  Id.

## JURISDICTION AND STANDARD OF REVIEW

The court exercises jurisdiction pursuant to 19 U.S.C. § 1516a and 28 U.S.C.

§ 1581(c) (2012), which grant the Court authority to review final determinations in a

CVD investigation.  "The court shall hold unlawful any determination, finding, or

conclusion found . . . to be unsupported by substantial evidence on the record, or

otherwise not in accordance with law."  19 U.S.C. § 1516a(b)(1)(B)(i).  "The results of

a redetermination pursuant to court remand are also reviewed 'for compliance with

the court's remand order.'" Xinjiamei Furniture (Zhangzhou) Co. v. United States, 38

CIT __, __, 968 F. Supp. 2d 1255, 1259 (2014) (quoting Nakornthai Strip Mill Public

Co. v. United States, 32 CIT 1272, 1274, 587 F. Supp. 2d 1303, 1306 (2008)).

---

[5] Commerce investigated respondents' purchases of natural gas for power generation—i.e., natural gas in its gaseous form exclusive of CNG and liquified natural gas—from the GOT.  See Preliminary Decision Memo at 15–16; Final Decision Memo at 13–14.

## DISCUSSION

## I.    Reliance on IEA Data

Habaş challenges Commerce's reliance on the IEA data as a tier three benchmark against which to measure the adequacy of remuneration for purchases of natural gas from the GOT.  <u>See</u> [Pl. Habaş's Cmts.] Opp'n [<u>Remand Results</u>] at 3–32, Mar. 9, 2020, ECF No. 71 ("Habaş's Br.").  Habaş submits that Commerce "erred in rejecting the reliability of" the Russian Eurostat and COMTRADE data and "failed to adequately consider evidence" weighing against use of the IEA data.  <u>See</u> Habaş's Br. at 17–32.  Defendant and Nucor counter that Commerce's determinations are reasonable and accord with agency practice.  <u>See</u> Def.'s Resp. Cmts. [<u>Remand Results</u>] at 11–25, Apr. 7, 2020, ECF No. 76 ("Def.'s Br."); [Nucor's] Opp'n to Pl. Habaş's Cmts. on [<u>Remand Results</u>] at 5–20, Apr. 7, 2020, ECF No. 77 ("Nucor's Br.").  For the following reasons, Commerce's decision to rely on the IEA data is supported by substantial evidence.

Commerce imposes a CVD when it determines that a foreign government provided a financial contribution resulting in a benefit to the recipient, and the government's provision of goods is for LTAR.  <u>See</u> 19 U.S.C. § 1677(5)(E).  Commerce measures the adequacy of remuneration "in relation to prevailing market conditions for the good . . . being provided" in the country subject to review.  19 U.S.C. § 1677(5)(E)(iv).  Its regulations set out a hierarchy of methodologies to identify the appropriate benchmark.  19 C.F.R. § 351.511(a)(2).  Under the "tier one" benchmark,

Commerce compares the "government price to a market-determined price for the good or service resulting from actual transactions in the country in question." Id. at § 351.511(a)(2)(i).   If in-country market prices are not available, then under the tier two benchmark, Commerce "compar[es] the government price to a world market price where it is reasonable to conclude that such price would be available to purchasers in the country in question." Id. at § 351.511(a)(2)(ii).  Should that benchmark also be unavailable, Commerce will measure remuneration with the tier three benchmark, which "assess[es] whether the government price is consistent with market principles." Id. at § 351.511(a)(2)(iii).

On remand, Commerce now reconsiders its reliance on Russian Eurostat data as a tier two benchmark, and considers for the first time the COMTRADE data placed on the record by Habaş.  See generally Habaş's Rebuttal NFI & Cmts.  Commerce finds both the Russian Eurostat and COMTRADE data unreliable for use as a tier two benchmark due to distortions in the export prices of natural gas from Russia into the EU, and also finds both sources unreliable for use as a tier three benchmark due to the likelihood that the pricing data contains information on CNG.[6]  See Remand Results at 6–7, 26.

Commerce initially predicated its determination that Russian Eurostat data constitutes a reliable tier two benchmark on two findings.  First, Commerce found

---

[6] Commerce continues to find that there was no usable market-determined "tier one" benchmark because of the GOT's "overwhelming involvement" in Turkey's natural gas market, which distorts private transaction prices.  See Remand Results at 6; see also Preliminary Decision Memo at 15–16; Final Decision Memo at 13.

that Turkish purchasers had access to natural gas from Russia through pipelines, thus satisfying the requirement under 19 C.F.R. § 351.511(a)(2)(ii) that the agency reasonably conclude that the prices used as the tier two benchmark "would be available to purchasers in the country in question." See Final Decision Memo at 13; see also 19 C.F.R. § 351.511(a)(2)(ii).  Second, Commerce found that there was no record evidence to demonstrate that Russian governmental influence over domestic prices for natural gas—as exerted via monopoly control of the market through Gazprom, a Russian state-owned entity—extended to Russian export prices for natural gas.  See Remand Results at 6 (citing Preliminary Decision Memo at 13).

Commerce reconsiders the latter finding, and now determines, based on additional analysis and information placed on the record, that Russian export prices for natural gas are influenced by Russian foreign policy objectives.[7]  Id. at 6–7. Namely, Commerce cites an EU Parliament Report provided by petitioners, which indicates that Russia "uses its energy wealth" to "protect and promote its interests in

---

[7] Prefacing its remand analysis, Commerce invokes recent CVD proceedings involving Turkey that likewise determine Russian export prices for natural gas to be influenced by foreign policy objectives.  See Remand Results at 6 (citing Steel Concrete Reinforcing Bar from [Turkey], 84 Fed. Reg. 36,051 (Dep't Commerce July 26, 2019) (final results and partial rescission of [CVD] admin. review; 2016) ("Turkey Rebar II") and accompanying Issues and Decisions Memo. for [Turkey Rebar II] at 16–17, C-489-819, (July 18, 2019) available at https://enforcement.trade.gov/frn/summary/turkey/2019-15824-1.pdf (last visited June 18, 2020) ("Turkey Rebar II IDM") and Steel Concrete Reinforcing Bar From [Turkey], 84 Fed. Reg. 48,583 (Dep't Commerce Sept. 16, 2019) (prelim. results of [CVD] admin. review; 2017) ("Turkey Rebar III") and accompanying Prelim. Decision Memo. for [Turkey Rebar III] at 11, C-489-830, (Sept. 6, 2019) available at https://enforcement.trade.gov/frn/summary/turkey/2019-19921-1.pdf (last visited June 18, 2020).

its 'near abroad' and to make its geopolitical influence felt further afield, including in

Europe." Remand Results at 17 (quoting Nucor's Jan. 16th NFI Memo at Attachment

1) (emphasis removed).  According to Commerce, the EU Parliament Report provides

"multiple instances in which Russia likely used its energy leverage for political

purposes," and notes that "many of the affected countries were within the EU."  Id.

(citing Nucor's Jan. 16th NFI Memo Attachment 1 at 13, 15–16).  Commerce thus

determines that the Eurostat data and COMTRADE data, covering exports of natural

gas from Russia into Turkey, are influenced by foreign policy objectives and thus

unsuitable for use as a tier two benchmark.  See id. at 6–7, 16 n.67.

Commerce also revisits its finding that Eurostat data on natural gas is not

distorted by prices for CNG.  See Remand Results at 4–5, 7, 26–27; Habaş, 413 F.

Supp. 3d at 1359–60.  Commerce now finds that prices for natural gas contained in

the customs-sourced data—i.e., the Eurostat data and COMTRADE data—are likely

distorted by pricing data for CNG.  See Remand Results at 7, 26–27.  Commerce

explains that, similar to the benchmark data from the Global Trade Atlas ("GTA")

that it rejected in the Final Results,[8] the Russian Eurostat and COMTRADE data

"relate to HTS subheading 2711.21" which "cover[s] natural gas in its gaseous state."

Remand Results at 26; see also id. at 4 (citing Habaş, 43 CIT at __, 413 F. Supp. 3d

---

[8] Habaş provided benchmark data from the Global Trade Atlas ("GTA"), Eurostat,
and Energy Experts international.  See Letter From Habaş re: Benchmarking Data,
PD 101, bar code 3599709-01 (July 26, 2017) ("Habaş's NFI").

at 1359–60).[9]  Commerce infers that "at least a portion of imports under this heading

are likely [CNG]," because natural gas can only be delivered by pipeline, and the

HTS subheading contains "exports from the rest of the world, including countries that

are not connected to the EU via pipeline[.]"  Remand Results at 27.  Although Habaş

cites evidence that most of the COMTRADE data under HTS 2711.21 covers EU

imports of natural gas from countries connected by pipeline, see Habaş's Br. at 17–

22,[10]  Commerce explains that it cannot identify the extent to which the heading

[9] Habaş argues that, unlike the GTA data, the COMTRADE data does not present any conversion issues.  See Habaş Br. at 26–28; see also Habaş, 43 CIT at __, 413 F. Supp. 3d at 1360.  Habaş adds that, unlike the Russian Eurostat data, the COMTRADE data is not limited to EU data on imports from Russia.  See Habaş's Br. at 27.  Although Commerce mentions that the customs-sourced trade data "requires conversions of varying complexities at the time of data collection [,]" Remand Results at 21, Habaş's arguments are rendered inapposite by the fact Commerce predicates its determination not to rely on the COMTRADE customs-sourced data on its inference that an indeterminate portion of pricing data under the HTS 2711.21 subheading relates to CNG.  See Remand Results at 7 & n.30; see also id. 26–27.

[10] Habaş alleges that Commerce ignores record evidence that demonstrates imports under the HTS 2711.21 subheading contain only a negligible amount of CNG, if any at all.  Habaş's Br. at 19–20 (citing Data to Commerce Pertaining to Habaş, PRR 14, bar code 3932464-01 (Jan. 16, 2020)).  Habaş explicates that 98.03 percent of natural gas imports into the EU come from pipeline suppliers, and that the remaining percentage of imports are either too small to be relevant (i.e., data from the United States and Serbia), are from suppliers that Commerce does not consider in its calculations (i.e., Turkey), or are from suppliers that the EU pipeline runs through (i.e., Switzerland).  See id. at 20 (citing Habaş's Rebuttal NFI & Cmts. Ex. 1 at 12).  Habaş adds that because the EU pipeline runs through Switzerland, import data from Switzerland under HTS 2711.21 would relate to imports of natural gas, and submits that even if Swiss import data under the HTS 2711.21 contains data for CNG, "the quantity is negligible[,] and the unit value is in line with the AUVs of other suppliers."  Id.  However, as Nucor notes, Habaş's reasoning rests on an unsupported presumption that there is no trade in CNG between states connected by pipelines.  See Nucor's Br. at 7.  Further, Habaş's argument, even if true, fails to demonstrate that Commerce's selection of the IEA data is unreasonable.  See Def.'s Br. at 17.

covers values and quantities relating to shipments of CNG.[11]  Remand Results at 26–

27.  Commerce thus declines to rely on the Russian Eurostat or COMTRADE data to

construct a tier two or tier three benchmark.  Id. at 7, 26–27.

    As for the IEA data, Commerce, pursuant to a tier three analysis,[12] reasonably

determines that the IEA report is the only transparent and reliable source of

benchmark data against which to measure the adequacy of remuneration for the

provision of natural gas from the GOT to respondents.  See Remand Results at 8–11,

---

[11] Stating that "there is no evidence on the record that there is any value difference
between [natural gas] and CNG" and that the two products "share[ ] the same HTS
category," Habaş infers that "there is reason to believe that the differences [in unit
value] between [natural gas and CNG] is insubstantial."  Habaş's Br. at 21–22.
Habaş cites no record evidence to support this inference, and it is reasonably
discernable that Commerce infers, conversely, that the difference in unit value
between CNG and natural gas is significant.  See Remand Results at 26–27.  Habaş's
provision of another possible inference alone fails to demonstrate that Commerce's
inference is unreasonable.  See Daewoo Elecs. Co. v. Int'l Union of Elec., Elec., Tech.,
Salaried & Mach. Workers, 6 F.3d 1511, 1520 (Fed. Cir. 1993).  Habaş also submits
that Commerce initially inferred that customs data for Russian export of natural gas
did not include CNG, suggesting that it is arbitrary and capricious for Commerce to
infer the opposite on remand without citing additional evidence.  See Habaş Br. at 21
(citing Final Decision Memo at 13).  However, the court remanded Commerce's
determination on this issue for further explanation or reconsideration.  See Habaş,
413 F. Supp. 3d at 1359–60 ("Commerce appears to have selected the Russian
Eurostat data even though it, too, may contain CNG.  Commerce does not address
this evidence or explain why, unlike the GTA data, the Russian Eurostat data
reasonably reflect natural gas, exclusive of [liquid natural gas] and CNG.").

[12] Commerce determines that the IEA data does not constitute an appropriate tier
two benchmark because the data does not relate to prices for natural gas available to
Turkish purchasers by countries connected to Turkey by pipeline.  See Remand
Results at 7.

26–27.   Consistent with its regulatory preference,[13] Commerce initially assesses whether government prices for natural gas in Turkey are determined based on market principles, and determines that they are not for reasons undisputed by the parties.[14]  See id. at 8–11; see also 19 C.F.R. § 351.5111(a)(2)(iii).  Having determined that the Russian Eurostat and COMTRADE data are unusable for purposes of a tier two or tier three analysis, Commerce does not consider whether the COMTRADE and Russian Eurostat data conform with market principles.  See Remand Results at 7–

---

[13] In relevant part, the CVD Preamble notes, with respect to tier three benchmark prices, that "in situations where the government is clearly the only source available to consumers in the country," Commerce "normally will assess whether the government price was established in accordance with market principles."  See Countervailing Duties, 63 Fed. Reg. 65,348, 65,378 (Dep't Commerce Nov. 25, 1998) (final rule) ("CVD Preamble").  Where Commerce determines that the government price is not set in accordance with market principles, it resorts to "an appropriate proxy to determine a market-based natural gas benchmark."  Remand Results at 9 (citing Countervailing Duty Investigation of Certain Cold-Rolled Steel Flat Products From the Russian Federation, 81 Fed. Reg. 49,935 (Dep't Commerce July 29, 2016) (final affirmative [CVD] determination and final negative critical circumstances determination) ("Cold-Rolled Steel from Russia") and accompanying Issues and Decisions Memo. for [Cold-Rolled Steel from Russia] at cmt. 7, C-821-823, (July 20, 2016) available at https://enforcement.trade.gov/frn/summary/russia/2016-17937-1.pdf (last visited June 18, 2020). ("Cold Rolled Steel from Russia IDM")).

[14] Commerce observes that all of the board members of Boru Hatlari ile Petrol Taşima A.Ş. ("BOTAS"), the state economic enterprise from which Habaş purchases its natural gas, are appointed by approval of the Turkish President and Turkish Prime Minister.  Remand Results at 8 (citing Preliminary Decision Memo at 14).  Further, Commerce cites record evidence indicating, inter alia, that BOTAS does not operate as a profit seeking independent venture; that Turkey's domestic gas market is distorted both by inconsistent application of BOTAS's pricing mechanism as well as BOTAS's practice of setting tariffs for eligible consumers at below the weighted-average cost of gas; and that BOTAS operates at possible losses due to its pricing policy.  See Remand Results at 8–9 (citations omitted).  These findings were not challenged below.

11, 26–27; see also 19 C.F.R. § 351.511(a)(2)(iii). Accordingly, Commerce determines

that the only reliable benchmark source is the IEA data. Id. at 10–11.

First, unlike the COMTRADE and Russian Eurostat data, which are customs-

sourced, Commerce observes that the IEA report contains prices of natural gas to

end-use consumers, eliminating the possibility of capturing prices for natural gas that

are subject to subsequent transactions.[15]   See Remand Results at 20.   Second,

acknowledging Habaş's concern that the IEA report is sourced on a country-specific

basis, and that data collection methodologies may differ between sources, Commerce

notes that the IEA report also provides its methodological descriptions on a country-

specific basis.[16]   Id.   Commerce further addresses Habaş's concerns regarding the

distortive effect of inconsistent collection methodologies by explaining that the agency

---

[15] Habaş argues that Commerce's "level-of-trade" consideration is "bogus," alleging that it has not prevented Commerce from relying on customs data in other proceedings. Habaş's Br. at 29 (citations omitted). Habaş misrepresents Commerce's position. Commerce is not claiming that it cannot rely on customs data; rather, the agency cites the fact that IEA report contains prices to end users as one reason why the data is preferable in this instance. Further, Habaş's bare characterization of Commerce's reasoning as a "post hoc rationalization" is unclear, and otherwise unavailing. See id.

[16] Habaş's also claims that the "opacity" of the methodological description accompanying the Polish data is "manifest." Habaş's Br. at 31. Commerce disagrees that the IEA report lacks methodological transparency and reasonably explains why the methodological descriptions are sufficient. Remand Results at 19–20. The court declines to reweigh the evidence.

is "construct[ing] a broad benchmark covering numerous countries."[17]  Id.  It is

reasonably discernible that Commerce views the breadth of the IEA data used to

construct the benchmark as sufficient to ameliorate any distortions caused by varying

collection methodologies.[18]  See Borusan Mannesmann Boru Sanayi ve Ticaret A.Ş.

v. United States, 41 CIT __, __, 222 F. Supp. 3d 1255, 1266–67 (2017) (quoting NMB

Singapore Ltd. v. United States, 557 F.3d 1316, 1319–20 (Fed. Cir. 2009)); CS Wind

Vietnam Co. v. United States, 832 F.3d 1367, 1373, 1376–77 (Fed. Cir. 2016).

Habaş argues Commerce's determination that Russian export prices are

influenced by foreign policy objectives is not supported by substantial evidence.

Habaş Br. at 22–26.  Habaş claims that Commerce fails to identify any evidence that

specifically demonstrates prices for natural gas from Russia into the EU were

---

[17] Habaş argues that Commerce cannot test whether differences between the country-specific methodologies that source the IEA report undermine the accuracy of the data. Habaş's Br. at 30.   Again, Commerce observes that the IEA report provides descriptions for each source's methodology, and that such concerns are limited here, where the agency is using the data to construct "a broad benchmark covering numerous countries."  Remand Results at 20.

[18] Commerce also argues that agency precedent supports the reliability of the IEA data as a tier three benchmark.  See Remand Results at 9–10, 19, 22 (citing Turkey Rebar II IDM at 19; Steel Concrete Reinforcing Bar from the [Turkey], 82 Fed. Reg. 23,188 (Dep't Commerce May 22, 2017) (final affirmative [CVD] determination) ("Turkey Rebar I") and accompanying Issues and Decisions Memo. for [Turkey Rebar I] at cmt. 4, C-489-830, (May 15, 2017) available at https://enforcement.trade.gov/frn/summary/turkey/2017-10505-1.pdf  (last visited June 18, 2020).

distorted by foreign policy objectives during the period of investigation.[19]  <u>See</u> <u>id.</u>
However, it is reasonable here for Commerce to predicate its determination that
Russian export prices are not market-driven based on a pattern of abusing its
"dominant market position in support of foreign policy goals."  <u>See</u> <u>Remand Results</u>
at 16–17 & n.74 (citing Nucor's Jan. 16th NFI Memo, Attachment 1 at 13).  Moreover,
Habaş claims that it is "sheer speculation on Commerce's part to presume that
Russian pricing to the EU is political[,]"  <u>id.</u> at 23, but appears to ignore the segments
of the EU parliament report that Commerce cites to demonstrate that prices for
Russian exports of natural gas into the EU "are driven to a great extent by [Russian]
geo-political concerns[.]"  <u>See</u> <u>Remand Results</u> at 16–17.  As Commerce explains:

> Habaş downplays the significance of this information. First, Habaş
> asserts that the [Government of Russia's] geo-political influence in the
> energy market is limited to "near abroad" countries within the Russian
> sphere of influence and does not extend to the EU. Record evidence
> indicates otherwise. For example, the European Parliament Report
> provided by the petitioners observed that "Russia uses its energy wealth
> as well to protect and promote its interests in its 'near abroad' and to
> make its geopolitical influence felt further afield, including in Europe.
> The report provides multiple instances in which Russia likely used its
> energy leverage for political purposes, and many of the affected
> countries were within the EU.

---

[19] Habaş also appears to argue that Russia could not exert control over export prices
for natural gas because Gazprom is contractually required to sell to the EU under
long-term contracts with prices pegged to the world-market price of oil.  <u>See</u> Habaş's
Br. at 9 (citing Habaş's NFI  at 4–5).  However, Commerce cites evidence that these
contracts can be, and are, re-negotiated on a country specific basis, and that the share
of contracts with prices pegged to the price of oil is shrinking.  <u>Remand Results</u> at 17
(citing Nucor's Jan. 16th NFI Memo, Attachment 1 at 13; Nucor's Jan. 17th
Clarification on NFI at Attachment 1, PRRs 17–18, bar codes 3933483-01–02 (Jan.
17, 2020)).

Remand Results at 17 (citing Nucor's Jan. 16th NFI Memo, Attachment 1 at 13, 15–16); see also Nucor's Br. at 10 (citing Nucor's Jan. 16th NFI Memo, Attachment 1 at 4–5).  Regardless, Habaş urges that the "secondary information" Commerce relies on should give way to "primary information"—namely, the statistical conformity that purportedly exists between the Russian Eurostat and COMTRADE trade statistics. See Habaş's Br. at 24.  However, as explained, Commerce finds the trade statistics unreliable as a source of benchmark data in this instance.  See Remand Results at 18.  Further, contrary to Habaş's claim that Commerce "sidesteps any analysis involving the Comtrade/Eurostat data[,]" Habaş's Br. at 17,  Commerce observes that it "do[es] not view the COMTRADE data as 'cross-validated' with the Eurostat data[ ] as Habaş urges" because of "an approximately 10 percent difference [in total import value for the EU] between the two datasets" in "the total import value for the EU-28 from Russia[.]"  Remand Results at 27 n. 97.

Habaş also challenges the reliability of the IEA data.  Namely, Habaş argues that the inclusion of household prices for natural gas in the IEA's Austrian-sourced data undermines the report's reliability as a source for benchmark data because Habaş purchases natural gas for electricity generation.  See Habaş's Br. at 30–31. Habaş also claims that the IEA data is not limited to natural gas provided by pipeline. See Habaş's Br. at 31–32; but see Nucor's Br. 9–10, 14–15.[20]

---

[20] Nucor submits that these arguments were not exhausted before the agency.  See

(footnote continued)

Contrary to Habaş's suggestion that all end-use prices for natural gas included in the IEA's Austrian-sourced data contain information from household users, see Habaş's Br. at 31, the cited section of the IEA report indicates that industrial prices and household prices are calculated by using different methodologies, which demonstrates the data for those categories of prices are given separate consideration. See Jan. 14th NFI Memo. Ex. 10, Attachment 3 at 57, PRR 8, bar code 3930375-05 (Jan. 14, 2020) ("IEA Report") (describing distinct methodologies for calculating or deriving industrial prices and household prices). Further, the preceding tables containing the data produced by those methodologies distinguish between industry prices and household prices. See id. at 53–57. From Commerce's commendations of the IEA report's "substantial methodological information," it is reasonably discernible that Commerce viewed the tables and the accompanying methodological descriptions and determines that the industry prices do not contain household prices. See Remand Results at 19–20.

---

Nucor's Br. at 9–10, 14–15 (citing Habaş's Br at 31–32; Habaş's Rebuttal NFI & Cmts. at 11–13; Habaş's Draft Comments at 10–12, PRR 25, bar code 3935224-01 (Jan. 23, 2020) ("Habaş's Draft Cmts.")). Absent a strong contrary reason, parties are generally required to present all issues and arguments to Commerce at the time that the agency is addressing the issue. See Boomerang Tube LLC v. United States, 856 F.3d 908, 912–913 (Fed. Cir. 2017); Dorbest Ltd. v. United States, 604 F.3d 1363, 1375 (Fed. Cir. 2010). Nonetheless, Habaş challenged the reliability of the IEA data before the agency, see Habaş's Draft Cmts. at 10–12; and, from Commerce's response to Habaş's comments regarding the IEA report, it is reasonably discernible that Commerce found the IEA data reliable after scrutinizing the entire report, notwithstanding the particular issues Habaş raises here. See Remand Results at 19–22.

Habaş also cites to various occurrences of data in the IEA report relating to liquid natural gas ("LNG") and CNG to support its position that the IEA report is not restricted to natural gas delivered by pipelines.  See Habaş's Br. at 32 (citing IEA Report at 119, 137, 143, 161, 191, 220, 285).  Habaş misses the point.  Commerce's issue with the customs-sourced data on the record is that an indeterminate portion of the pricing data under the HTS subheading 2711.11, covering natural gas in its gaseous state, likely pertains to CNG.  See Remand Results at 27.  Although the IEA report contains information on LNG and CNG, none of the portions of the IEA report that Habaş cites appears to present an instance where data covering natural gas might also pertain to CNG or LNG.  Indeed, as Nucor argues, the fact that the IEA report distinguishes between natural gas, LNG, and CNG, suggests the opposite.  See Nucor's Br. at 16–19.  Given Commerce's decision not to rely on customs-sourced data that might relate to CNG, see Remand Results at 27, it is reasonably discernible that Commerce did not rely on data for CNG or LNG when constructing the benchmark using the IEA report.

Moreover, Habaş submits that CNG and natural gas are commercially indistinguishable and that any value difference between them is insubstantial, see Habaş's Br. at 21, but Nucor points out that Habaş neither raised the argument before Commerce nor placed any evidence on the record demonstrating that the prices are the same.  See Nucor's Br. at 9–10.  Nonetheless, it is also reasonably discernible, from Commerce's reliance on its previous finding that CNG and natural gas are

different products that are delivered in different ways, that the agency infers there is

a difference in value between the two products as well.  See Remand Results at 26–

27 (citing Rebar, 43 CIT at __, 389 F. Supp. 3d at 1382–84); see also Rebar, 43 CIT at

__, 389 F. Supp. 3d at 1382–84 (noting Commerce's finding, based on an explanation

from the GOT, that CNG is a "different product that is shipped in canisters rather

than through pipelines.") (citations omitted)).

      Habaş does not persuade that Commerce's rejection of the Russian Eurostat

and COMTRADE data or reliance on the IEA data is unreasonable.  It is logical for

Commerce to deduce that, because the subheading HTS 2711.11 in the customs-

sourced data covers natural gas in its gaseous state, and because some of the pricing

data relates to trade between states that are not connected by pipelines, the custom-

sourced data includes CNG.   Further, it is not unreasonable to conclude  that the

physical differences between the products, as well as the differences in how the

products are delivered, evince commercial differences between natural gas and CNG.

See Remand Results at 27.  Regarding the IEA data, it is discernible that Commerce

reasons that prices contained in a published and distributed energy report sourced

by various national agencies are reliable.  See Remand Results at 9, 19.  Not only do

government sources generally have a stake in producing accurate information, the

process of publishing a comprehensive report normally entails an intensive review

process.  Finally, Commerce's decision to construct a broad benchmark would temper

any distortions arising from the purported idiosyncrasies between the various source-

methodologies comprising the report by capturing a larger sample of data.  <u>See</u> <u>Remand Results</u> at 19–20.  Habaş fails to point to evidence that impugns the reasonableness of Commerce's determination.  In light of the deference this court affords Commerce in identifying, selecting, and applying its CVD methodologies, Commerce's determination to rely on the IEA data as a tier three benchmark is reasonable.  <u>See</u> <u>Fujitsu General Ltd. v. United States</u>, 88 F.3d 1034, 1039 (Fed. Cir. 1996).

## II.    Adjustments to IEA Data

Habaş argues that Commerce's adjustments to Russian export prices for natural gas contained in the IEA report to address the distortive effect of Russia's foreign policy considerations are not supported by substantial evidence. <u>See</u> Habaş's Br. at 32–33.  Defendant and Nucor counter that Habaş's proposed adjustments are based on the COMTRADE data, which Commerce finds unreliable.  <u>See</u> Def.'s Br. at 24–25; Nucor's Br. at 19–20.  Commerce's adjustments are reasonable.

Because Commerce determines that Russian export prices are distorted by Russian foreign policy objectives, Commerce also determines that "each Russian shipment to the EU leads to a corresponding distortion of the average EU price used for benchmarking purposes[.]" <u>Remand Results</u> at 10.  To correct for the distortion, Commerce, relying on several pieces of record evidence, explains its methodology:

> First, natural gas imports (from all sources) amount to an estimated 67 percent of the EU market for natural gas, and 39.5 percent of those imports come from Russia.  Second, we estimated the average price of Russian exports to the EU during the POI.  Using this information, to

> account for the effect, we multiplied the Russian export AUV by Russia's
> share of the EU natural gas market, i.e. 26.47 percent, considering that:
> (1) an estimated 67 percent of the EU market for natural gas is
> comprised of imports; and (2) Russia supplied 39.5 percent of EU natural
> gas imports during the POI. We then subtracted this amount from the
> EU AUV and divided the difference by the share of non-Russia supplied
> natural gas in the EU market (i.e. 73.54 percent, based on our estimate
> above that 26.47 percent of the EU market is comprised of Russian
> imports).

Id. at 10–11 (citations omitted).  Commerce notes that its adjustment is consistent

with recent practice.  Id. at 11 (citing Steel Concrete Reinforcing Bar from [Turkey],

84 Fed. Reg. 36,051 (Dep't Commerce July 26, 2019) (final results and partial

rescission of [CVD] admin. review; 2016) ("Turkey Rebar II") and accompanying

Issues and Decisions Memo. for [Turkey Rebar II] at 20, C-489-819, (July 18, 2019)

available  at   https://enforcement.trade.gov/frn/summary/turkey/2019-15824-1.pdf

(last visited June 18, 2020); Steel Concrete Reinforcing Bar From [Turkey], 84 Fed.

Reg. 48,583 (Dep't Commerce Sept. 16, 2019) (prelim. results of [CVD] admin. review;

2017) ("Turkey Rebar III") and accompanying Prelim. Decision Memo. for [Turkey

Rebar   III]   at   15,   C-489-830,   (Sept.   6,   2019)   available  at

https://enforcement.trade.gov/frn/summary/turkey/2019-19921-1.pdf   (last   visited

June 18, 2020) (final results not yet issued)).

Habaş argues that Commerce should rely on the COMTRADE data to make its

adjustments to Russian export prices.  See Habaş's at 32–33 (citing Habaş's Rebuttal

NFI & Cmts.).   However, Commerce explains that it declines to rely on the

COMTRADE data to render the adjustment for the same reasons it declines to rely

Consol. Court No. 18-00144                                                      Page 24

on customs-sourced data as a tier two or tier three benchmark.  <u>See</u> <u>Remand Results</u>

at 23–27.  Namely, Commerce determines that the custom-sourced data on the record

relate to an HTS subheading that contains pricing data for CNG.  It is reasonable for

Commerce not to employ COMTRADE data to render its adjustments to the IEA data

because relying on data that is likely comprised of an indeterminate amount of CNG,

which  Commerce  finds  to  be  a  different  commercial  product,  would  distort

Commerce's adjustment to the benchmark for natural gas.  <u>See</u> <u>id.</u>

## CONCLUSION

For the foregoing reasons, the <u>Remand Results</u> comply with the court's order

in <u>Habas</u>, are in accordance with law and supported by substantial evidence, and are

therefore sustained.  Judgment will enter accordingly.


                                                    /s/ Claire R. Kelly
                                                    Claire R. Kelly, Judge

Dated:        June 25, 2020
              New York, New York